Good morning, Your Honors, and may it please the Court. I'm Robert Diving for Deputy Christopher Stem. Deputy Stem had probable cause to arrest Mr. Rogers in September of 2011. Beginning on April 13th of 2011, every contact that the Hanover County deputies had with the Custom Blends tobacco store added evidence that the store was selling illegal substances banned by Virginia's new emergency anti-drug law. Beginning on – I have to find probable cause here in order for your client to prevail? Well, Your Honor, in this case, it's on appeal based on qualified immunity, and as the Court knows, qualified immunity is a two-step process. We win if it pleases the Court. Deputy Stem would prevail on the one hand if this Court were to find, as we submit, he had probable cause to arrest Mr. Rogers either under subsection F or A of the statute. Secondarily, under qualified immunity, the Court will ask as a second component of the inquiry whether a reasonable deputy would have known under the circumstances that he was violating clearly established law. In other words, there's an exception from the Saussure v. Katz case, as the Court knows. If the reasonable deputy could have believed he had probable cause, qualified immunity affords the deputy protection even if probable cause was lacking as a matter of law. Your Honor? You said A or F. I thought everyone was in agreement that what we're talking about is section F substances. Yes, Your Honor. The case does involve subsection F as an element of probable cause as Deputy Stem presented the facts to the magistrate, but because under probable cause analysis, it is irrelevant what crime the accused was actually charged with if it was probable cause to arrest the person for any crime. He was charged under F, not A. Yes, sir, Your Honor. He was charged under F, not A. And under F, I'd like to address F first because F is a complicated statute that says that synthetic marijuana is illegal if it is privately compounded with a specific intent to emulate or simulate synthetic marijuana to evade the anti-drug laws, basically. I think it's my impression, or at least I'm pretty clear on probable cause with respect to believing that the substances might emulate synthetic cannabinoids. The piece that I had difficulty with and it seemed to trouble the District Court as well is the part that deals with cause to believe it was privately compounded with specific intent to emulate synthetic cannabinoids. Of course, and that is the heart of the case. How do we judge intent? When smugglers change a car, hollow out the car's panels in order to transport drugs across the border, what was the specific intent of the person who changed the interior of that car? Do we need to know who that person was or where those changes to the car's interior were made? Do we need to know the conditions under which that change was made? And the answer I submit is no. Does it matter that we're dealing with two separate entities here, the arrestee and the compounder? Those are not one and the same in this case. Indeed, Your Honor, and that's what makes this statute especially curious because it requires the specific intent of Y as a predicate for arresting X. And how do we know the specific intent of Y, the compounder, in order to justify arresting X, Mr. Rogers? And the answer I submit is that a number of factors combine to form a compelling case of specific intent. Number one, this product was marketed as Bayou Blaster along with Cush, which is a term that means marijuana, Atomic Angel, Hazy Train Wreck. These are not terms that one would use to connote getting high. Next. So you're starting to go through the list of the things that you would say would allow a reasonable officer to draw a reasonable inference of the intent of the other party, the compounder. Yes, sir. And the products were sold at $38 for 1.5 grams. As the Court knows, 1.5 grams is about the size of a couple of match heads. If indeed it was herbal incense designed to be smoked or burned for its aromatic qualities, that would last about a minute, perhaps, $38. Indeed, if it was herbal incense, why did it contain AM-2201, a known synthetic cannabinoid? We're here on an undisputed factual record. Deputy Stem's facts were not challenged in the District Court. Deputy Stem received special training in designer drugs, including the identification, the chemical properties, and characteristics of designer drugs. And when the DFS, the Division of Forensic Science, analyzed Bayou Blaster and determined that it contained AM-2201, Stem knew from training, as did his fellow investigator Parknow, that AM-2201 was synthetic marijuana. I also would note for the Court's consideration that on the very first visit to the store on April 13, Investigator Parknow noticed and seized an open packet of K-2. K-2 is a listed drug under Subsection A. And that illustrates from the start that this store was known to have an illegal drug in its possession. But that goes to the intent of the retailer, not the consumer. I don't mean to get off the track of specific intent of the compounder. If you could just stay with that for just a minute. You've given us two. Of course. Next. If it were indeed herbal incense, why did they put AM-2201 in it? That just defies logic why an aromatic would contain synthetic marijuana. Next. It's marked and marketed not for human consumption, but sold with a toxicology report. Methinks they protest too much. It's marked and marketed. If it's not for human consumption, what are they doing with a toxicology report? For cannabinoids? They knew, the compounder knew this was going to be smoked. They all knew it was going to be smoked. The clerk at the store said that she had tried Atomic Angel. It gave her the caffeine jitters. A customer said this stuff was too expensive not to work. To work? Incense works? No. Marijuana works. They all knew what was going on. But the compounder, by marketing the substance as Bayou Blaster, as Hazy Trainwreck, sending it not for human consumption, wink wink, with a toxicology report, knowing it would be consumed, allows us to draw a compelling inference, not just permissive, I submit, but a compelling inference that the manufacturer, the compounder, knew intended this to be, evade the anti-marijuana laws and to be synthetic marijuana. I don't think the record reflects any attempt to contact the compounder. It does not, Your Honor. I think the compounder was out of state. I don't know what influence that played in the decision to proceed against Mr. Rogers and not against the compounder. But if in fact he was out of state and there was no bar with respect to the compounding in that state, doesn't that suggest a different intent, a lawful intent? And that, Your Honor, gets us into a slightly different topic of that of qualified immunity. Because in qualified immunity cases, the officer is protected unless he violated clearly established law. The statute under which Mr. Rogers was charged refers to the I'm sorry, Your Honor? Doesn't everything, all the items that you just listed that could lead to a reasonable inference, that also plays into the qualified immunity analysis? Correct. And under Saussure, the court can proceed under either prong of the qualified immunity inquiry if the law is found to be unclear and unestablished, then deputies stem without further probing into whether there's a constitutional violation, deputies stem would still prevail. But the statute only refers to the specific intent of the compounder. It doesn't refer to where the compounder might be. Deputies stem was entitled to enforce the statute as it was written on an emergency basis. The district court and But the intent is the intent to evade Virginia law, right? Yeah, one would assume that, and that can happen. Well, if you've got a compounder who's operating out of state with no indication of where the product will end up, how does that support a specific intent to evade this statute? Well, it was sent to Virginia. The person, whether the compounder was in America or a foreign country, if the compounder sent the product to Virginia, ignorance of the law is no excuse, I submit, even if you're from out of state. And if the person compounded in Pennsylvania and mailed it to Virginia at a time when Virginia had a law banning synthetic cannabinoids, then that person, I submit, would have the specific intent satisfactory sufficient to charge Mr. Rogers under the first part of subsection F. The statute doesn't say where the compounder has to live. The district court raised what hurdle by saying that STEM was faulted for not knowing the identity of the compounder. The statute doesn't require that. Faulted STEM for not knowing where, when, or under what conditions AM2201 was compounded. The statute doesn't require that. Could I clarify one thing? You said, it was my understanding that each lab test of the seized herbal incense products came back negative for Section A chemicals? That's correct, except with regard to the K2 that was seized on April 13th. That is a Section A substance. That was seized April 13th. And Mr. Rogers, on September 8th, during execution of the search warrant, admitted that the K2 was on a desk that he referred to as his desk, and that it was a sample. Why a store is getting sample illegal drugs is another question. Right, but he was not offering it for sale. It was not, no, ma'am, no, Your Honor, it was not. It was on the desk in the back of the store, that's correct. So, of all of the compounds that were seized, none of them contained a Section A, that were seized, that were being offered for sale? That's correct. None of them contained a Section A compound? That's correct. So, I'm a little unclear. You suggested, as part of your explanation, that the seized packet with respect to the K, the product contained a K2 compound, that that somehow supported the probable cause analysis, and I'm not sure how. Indeed. Your Honor, when Deputy Stem presented facts to the Magistrate in his affidavit and his verbal discussion with the Magistrate, he told the Magistrate that Mr. Rogers, on September 8th, had admitted to having a sample when Mr. Rogers connected himself, by that statement, to the K2 that was found in April. That provided a nexus to charge him with a Subsection A violation. Was he so charged? No. But need he have been so charged for probable cause to exist? He need not have been so charged. The cases are clear, the probable cause exists, even if the suspect, the arrestee, could have been charged for an entirely different crime than that for which he was charged. When Stem applied for the arrest warrant, he referred to Bioblaster and other billions as Spice, did he not? Oh, he did, Your Honor, and if we could redraft that affidavit to change the generic term Spice to AM2201, which has been determined to, I'm sorry, to Bioblaster, which has been determined by DFS to contain AM2201. Since then? Nothing in Bioblaster at the time, it was not a Schedule A substance at the time? It was not Schedule A, but it was a synthetic cannabinoid as per Deputy Stem's training. The problem, though, is it could be interpreted as an intent to mislead. In which case, the court may strike whatever it deems misleading about Deputy Stem's. Well, you can't do that, I'm sorry, go ahead. I believe, Your Honor, I believe the law in this circuit is that if statements to a magistrate with regard to probable cause are found to be misleading, that the court may strike the misleading parts or those that are believed to have misled the magistrate, substitute what would have been true. I believe that methodology is what, in the Frank's case, designed to remedy cases where a misleading statement has been made innocently or otherwise, strike the misleading statement, insert the statement that should have been made, in which case probable cause would have existed because Stem had known that AM2201 was in Bioblaster, that was a subsection F substance, and he had compelling circumstantial evidence of the specific intent. A221 is a substance, is a section F substance? AM2201, yes, it was, yes, Stem was trained that AM2201 was privately, was a synthetic cannabinoid. He received special training in designer drugs and that was one of them. Your Honor, I see I have 30 seconds left. I'd like to just raise... Well, let me ask you another question about the specific intent element because you said that ignorance of the law generally is no defense and I agree with that as a general proposition but the way this statute is written, it talks about the specific intent to circumvent the criminal penalties for synthetic cannabinoids. Doesn't that suggest that there has to be some knowledge on the part of the compounder with respect to those criminal penalties? Your Honor, I don't believe so. I don't believe that the compounder has to know the specifics of Virginia law in order to be, to have that specific intent. I'm sorry. Section F is this catch-all provision for non-listed substances, correct? That's correct. And AM2201 is, Stem knew was privately compounded with the specific intent to circumvent criminal penalties? He was trained that AM2201 was a synthetic cannabinoid. But that's not enough for Section F. Understood. That's the predicate. You start with the synthetic cannabinoid, then what was the specific intent of the compounder? No, no. This was really going back to my question about the application for the arrest warrant. And you said to substitute for spice something we know to be true. And that is that AM22, substitute items, products containing AM2201. And that doesn't help either because that gets you into the same problem that you are running into a probable cause for the other substances. And that is, it depends on whether or not the officer had a reasonable, had a basis for believing that it was privately compounded with specific intent. So you can't, I mean it becomes, your explanation becomes a circle. I don't believe it's a circle, Your Honor, because Stem's, if I can, I just ask the court's permission. No, sure. I asked you the question and you still have time for rebuttal as well. Understood. The circularity really disappears. The first part of the inquiry is are we dealing with a synthetic cannabinoid? Stem was trained that AM2201 fit that bill. Next, what is the specific intent of the compounder? And there we don't have direct evidence, we have circumstantial evidence. And of course when we're dealing with intent, we always have to rely on circumstantial evidence. And none of that was brought to the attention of the magistrate? Not to my knowledge in those terms, Your Honor. And again, I mentioned... Or in any terms that indicates the dependence of Section F on this finding of specific intent. Stem made a conclusory statement that he knew that the spice was privately compounded with a specific intent. That is a conclusory statement that did not contain the specifics involving the elements of circumstantial evidence that I listed for the court today. But I do think that there's evidence of to satisfy F. And I see that I'm in my... Am I in my rebuttal time now? You will have your full time for rebuttal. Thank you very much. Thank you, Your Honor. Mr. Glasper? If it pleases the Court, I'm Vic Glasper. I represent Roy Rogers. Let me point out that I represent Roy Rogers, not Customs Blends. One word before I get to my argument. This is the first time I've heard of a claim that Roy Rogers   regarding Subsection A. That has never appeared in this case. And if I look at the appendix on page 431... I think we understand that. Thank you. Deputy Stem is the source of his problems. His counsel said here that the statute here is especially curious. In the District Court, counsel said, I'll be the first to admit that the statute is not the best. That's the appendix at 443. He also said that the statute leaves something to be desired. Appendix at 440. In fact, it doesn't. This is the only known prosecution under Subsection F. If you undertake to use a wrench as a screwdriver, and it doesn't work, don't blame the tool. Blame the choice of instrument. This statute has one strict liability element. If you sell something or possess something that has these given chemical compounds, you can go to jail. If you sell something that was compounded with a specific intent of mimicking marijuana and violating Virginia law, you go to jail. That difference is critical for retailers. As any seller of Sudafed will tell you. As any seller of airplane glue will tell you. As any seller of alcoholic hand cleanser will tell you. All known subject to abuse. The statute makes perfect sense and avoids the difficulties that counsel both in this court and in the District Court have identified if aimed at the right people. Basement lab compounders. They're there. They're there in Hanover. I will, not by way of introducing evidence into the case, that isn't in the record below, but not two months ago I was hiking up Old Rag with somebody who we were talking about stuff and I was explaining about my work and he was telling me that he was compounding spice in his basement in Prince William County. I told him that I wanted to subpoena him to trial. These things happen. They're local. And the Virginia General Assembly has the perfect right to try to stay ahead. He's probably not going to go hiking with you again. Excuse me? He's probably not going to go hiking with you again. I'm sorry, sir. He said he's probably not going to go hiking with you again. I think you're right because I told him I'd subpoena him. The statute embodies the difficulties presented by defense counsel only if you seek to apply it as they have tried to apply it. They ask the question. It's a perfectly good question. What amount of evidence and what kind of evidence do I have to get against X to criminalize Y? In fact, the district judge observed in oral argument that this raised constitutional issues. Since we're dealing with qualified immunity, I didn't even raise that issue. I think that would be clear in a criminal case. We didn't touch that in this case. Mr. Diving listed a number of factors that he claimed led to at least a circumstantial case. And, of course, we're dealing with probable cause, not proof beyond a reasonable doubt, an intent oftentimes, as he pointed out, is difficult to find evidence of directly. Why isn't that circumstantial evidence that he listed sufficient? Okay, let me review the circumstantial evidence. Counsel talks about the funky names. Bayou Blaster. I don't think he used that term. Excuse me, Judge. I certainly didn't mean to use an inappropriate term, and I hope no one thinks that I did, but unusual. I was actually just teasing you, Mr. Diving. Okay. I just want to be sure. I remember one instance when Judge Sloviter was in this court and was not used to be called ma'am, to be called ma'am and took offense because she thought it was inappropriate. Just don't call her funky. You'll be all right. Yes, okay. In any event, unusual names. I put into the record, whether it be opium by Yves Saint Laurent, I put into the record cannabis perfumes and opium incense and Jamaican cannabis incense, and if I may, Judge, without making light of anything, but this just happened last night when I was discussing with my wife this very issue, and we happened to be eating dinner, and I happened to be sprinkling on my dinner, my steak, swamp venom made by the Dizzy Pig Company, and we are advised that if you use this, you will get spun. I hope I don't get arrested by Hanover County Police if I go through Hanover County with this. We live in a strange age. Names of things are often bizarre, and they bear no relation to what's actually going on. In fact, as Deputy Spen recognized himself and offered this example. I don't know if he offered it or I did. At page 204 of the appendix, the names are like those of rock bands with no rhyme or reason, page 204. Even though there may be a particular item by a blaster by itself that doesn't lend itself to being a reasonable inference, opposing counsel gave a long list of items that I assume his argument is taken together that would permit a reasonable officer to draw an inference as to intent. Well, I think you have to take a look at the items that he actually identified. The first is the names. Well, let's go to the second, which does make sense. $38 for 1.5 grams. He says it's two matchsticks? Well, I don't think that's correct, Judge. Or did it last for a relatively long time? The response to that is in the record. Both Mr. Rogers testified and Don Lindsey testified that they charge what the market will bear. Markups of 300% and 400% are common. They sell cigars for $20 that they buy for $6. They sell aromatizers. It's in the record that they buy for $100 for $400. They mark up. And, yes, there is a markup, but it's not out of line with the other markup, and it isn't matchsticks. It's a little packet of stuff. I don't know how to get this stuff. And they don't sell it anymore, by the way. And in addressing one of the points that Judge Diaz raised about the out-of-state vendors, when in 2012 the General Assembly deemed AM-2201 an unlawful substance, the provider of Bayou Blaster, which contained that product, notified Custom Blends, we're not sending this to Virginia anymore. So we have the toxicology reports. It seems odd to me that you would sell incense with a toxicology report unless you wish to inform not-so-subtly aging hippies who want to reconstruct some Woodstock memory as to what's in this and what's not in it. It just seems an odd thing for the compounder to do. Let me offer a response, Judge. First, let me suggest that you look at a label of any number of conventional household products which will tell you do not drink this stuff. Do not drink this stuff, not for human consumption. That's number one. Number two, no one pretends that spice doesn't exist. No one pretends that there are not compounders of material that some people smoke and that are unlawful as they should be and shouldn't be sold and shouldn't be wholesold either. The only thing we know about the compounder, well, actually, no, we know nothing about the compounder. There is nothing in the record about the compounder. The wholesaler was either in Arizona or California. There's evidence to that effect. There was no follow-up on that by the Sheriff's Office. They're selling this stuff all over the country. They are not unaware of issues regarding the abuse of their product, and they are reassuring their retailers that what they are selling is lawful. And as I said before, in 2012, when Bayou Blaster became unlawful because 22AM2201 became listed as Subsection A, it was they who informed Custom Lens, we're not sending this to you anymore, you can't sell it. The whole reason for this Subsection F is to stay ahead of these compounders that are waiting until something is explicitly prohibited under A and trying to devise a workaround. That's why we have Subsection F. I agree with that entirely, Judge. That's correct. So how is an officer supposed to enforce this statute? And isn't qualified immunity supposed to protect all but the plainly incompetent? What is it about these set of facts that make officers stem plainly incompetent? The English language, Judge. We have Subsection A, which says if you sell or possess these 10 or 12 compounds, you can go to jail. Subsection F says things which constitute the reason for which there is potential criminality. And it specifies something having to do with the specific intent of the compounder, not the retailer, not the wholesaler, the compounder, to evade Virginia law by creating a marijuana substitute. That is directly applicable to your basement producers in Virginia, in the local jurisdictions where they are. And I expect that numerous states may have such laws. What you can't do is take this statute, apply it where it's not meant to be applied, and then complain, as counsel have done in this court and in the court below, that the statute leaves something to be desired, that it's not the best, and it's especially curious. So I agree with you, Judge. Now, the Virginia General Assembly may have, I don't address constitutional issues, may have within their prerogative to say no herbal incense. You can't sell that stuff. We're regulated in some extreme way. They can do that, or they can undertake to identify a body of product that can't be sold. But they can't do what happened here. Law enforcement officers can't do what happened here. I interrogated... Here you have a law enforcement officer who perhaps is scratching his head. It's a new statute. It's not necessarily one that's completely plain. And he does what I think you would want any reasonable officer to do. He takes it up the chain of command. They then go to the Commonwealth's attorney, which none of that is a talisman, we know from our cases, but the Supreme Court continues to reemphasize this is an important factor. You just can't ignore it. The deputy's case would be much weaker, and your case would be much stronger, not that they aren't already, if he had just gone on and done this alone. But he did the things that you would want a police officer to do before they get a warrant. Several responses to that, Judge. First, a purely legal one. He did fudge a little on the warrant, though. Pardon me? That's the second one. Okay, I'm sorry. Take them in order. The first response is purely legal. I recognize that he went to others, and I understand the Torchinsky case. I understand that. That ordinarily, and in the case law that is developed on this issue, that has reference to facts. I was in this situation, and this is how it happened, and please tell me that I have probable cause. These are the relevant facts. Here we're dealing with a statute. It's a question of law. What is the scope of the statute? What are the elements of probable cause? And if I'm going to proceed under subsection F, am I to do anything at all regarding the specific intent of the compounder to avoid Virginia law by altering a radical? I submit to you that they have to address that. And if they don't, they can't stand around in a circle blaming the other guy, or not blaming the other guy, but pointing to the other guy and saying, okay, we all did it together. Three wrongs don't make a right. And this was a mistake, and I sued one of them. The other response is the one to which Judge Duncan referred. At no time did Officer Stem say, I've gotten a suspect plant material here. I think it may be subsection F, because it isn't subsection A. No subsection A. It's subsection F. It's plant material. Well, it's not illegal. It's not illegal unless I can show that it's been manufactured, compounded for the purpose of expressly violating Virginia law. Well, what you are being told, essentially, is my training and experience is sufficient. I can rely on my training and experience, and that is enough to establish both probable cause and qualified immunity. I respectfully submit that that usurps the role of two branches of government. First, it usurps the role of the legislature. The legislature said, these 10 compounds, these 12 compounds, and then in 1912, I think it's been amended twice, they keep on adding compounds, as is their right. These compounds are illegal. You cannot buy them, sell them, possess them. And then we have this other category where it's not illegal unless you show A, not the specific intent of the compounder. Officer Stem comes in and says, my training and experience says that this is spice. It's not A, and he has nothing on F, and he tells you, he tells the magistrate and he tells his bosses and the Commonwealth's attorney, this is my training and experience and it's spice. I don't think he can do that with regard to the legislative determination. I also don't think he can do it to you, because it is the judges who say what the law is. And I quoted Marbury v. Madison for the first time in my legal career, and I think it applies. Mr. Glasberg, what, in your view, would Officer Stem have had to do to show the specific intent of the private compounders? What evidence would satisfy you? I can speak in principle. As a practical matter, I think it might have been difficult, because we don't even know who it is, and we don't know where it is. We have no knowledge of it. For all we know, the AM-21 is a desiccating agent or something put on by the grower. I don't know. I don't have information on it. In principle, then? He would have had to obtain some information that could permit a magistrate to make a reasoned determination that there was a compounder. Such as? But you're reading the statute to me. What would do that? Judge, that would be very difficult with this product. This product comes to Virginia in a triple-sealed envelope, in the same form with the same print, identical to the envelopes that were issued to sell this product before this statute came into existence. And the invoices that Deputy Stem seized, some of them for this product, antedated the statute. I suppose, I mean, let's say it were in Maryland. Let's say that it was a local place. They could send out the Maryland State Troopers to the manufacturing plant and do an investigation and do whatever police personnel do and determine that they are intending to violate known law. I think the problem is the application of the statute to this situation. The failure to recognize that subsection F required a host of elements that were simply unavailable here. It's not that they tried and failed, Judge. It's not that they looked and couldn't succeed. They didn't see the issue. They saw spice, told everyone that it was spice, got the warrant because it was spice, and it was only when they got to the criminal court that the judge said, what's this? There's no offense. That's my best response. One final thing, Judge. If you look at the appendix at page 383, you will see that Deputy Stem told the internal affairs investigator who was investigating this matter that the seized product had the unlawful chemical in it. That's at page 383. That is not true. And I say that only for this purpose. I don't know what Deputy Stem told the magistrate. I don't know what he told the magistrate. He spoke in general terms. It was a long time after he actually spoke to the magistrate. There was no tape recording of what he told to the magistrate. But he told an internal affairs investigator who put him under oath, and police officers and sheriffs cannot, they vary from the truth at grave professional risk, that the product seized had the designated chemical in it. Untrue. So I think that you need to keep that in mind in considering the warrant as well. Thank you very much. Thank you very much. May it please the Court. With regard to the last point Counsel raised, the record before the Court is on Stem's undisputed facts by local rule in the Eastern District. If any facts proffered by Stem were disputed, Counsel had the obligation to do so on summary judgment. He did not do so. I would like to address qualified immunity. The Supreme Court, three months ago, in a case called Plumhoff, said, we have repeatedly told courts not to define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced. And that echoes, of course, this Court's jurisprudence, where you have said in the Merchant v. Bauer case that whether it is clear to a reasonable officer that the conduct in which he allegedly engaged was unlawful in the situation he confronted. The Supreme Court says that cases must place the constitutional question beyond debate, that the question needs to be whether the right was infringed at a high level of particularity. Your Honors, this case involves a fact situation dealing with designer drugs that is of recent provenance. There is no case law instructing us as to what quantum of proof is necessary to satisfy the specific intent component. There is no case law telling us what we need to do if the compounder is out of state. There is, however, and I submit in defense of Deputy Stem's conduct, abundant circumstantial evidence from which a reasonable deputy could believe that the Virginia statute as then written, it has since been repealed, but the Virginia statute was enforceable. The Supreme Court of Virginia, in the Shepard case, another recent case, reinforced the concept that Virginia laws are presumed by the General Assembly to mean something and be enforceable. The interpretation that would follow were the deputy obliged to plumb the specific intent of the compounders in Nevada and Arizona and other foreign places would make the law as drafted practically, as a practical matter, unenforceable. Mr. Dybing, what we have is a situation in which Officer Stem started coming to this shop on a number of occasions, and he would ask to purchase substances that he knew were illegal. G.I. Jane and some other things I had never heard of until I read this record. And every time he did so, the manager said, it's illegal, we don't sell it. Right? That's correct. But the manager went on to say that the other stuff we sell is, the customers tell us, it's just as good. Okay. And the significance of that is that it contained AM-2201, which is a synthetic anabenoid. And Mr. Stem obtained small quantities of several spices. Well, I think Stem bought Bayou Blaster, another deputy bought Hazy Trainwreck. And lab tests revealed that none of them contained Section A substances. Correct. Then he applies for a search warrant accompanied by an affidavit saying that while none of the store's substances tested positive for Section A substances, he knew from his personal experience, knew that the purpose of those products was to emulate them. And that's the same affidavit he used to apply for the arrest warrant. That's correct. All that the magistrate judge knew is that, was asked to rely on, was the investigator's certainty that the purpose of these substances was to emulate illegal ones. That's correct. But the investigator's certainty, as Stem averred in his affidavit, was based on the fact that the clerk had said that she had tried Atomic Angel and it gave her the jitters. In other words, that she knew that this was to be smoked, not burned as an aromatic. That's correct. But where do we go back to the specific intent? Oh, I think ultimately the specific intent dealing with the probable cause Bell-Nan inquiry depends on the circumstantial evidence that we alluded to earlier. But even with respect to the qualified immunity analysis, does it not seem to you that there's some fudging going on in that warrant? It was conclusory. I don't think he was fudging. I think Stem meant every word he said. He found synthetic cannabinoids, AM2201, in Bayou Blaster. To Deputy Stem, that made it SPICE, SPICE being the generic term for a synthetic cannabinoid. And so Stem, should he have said AM2201 as determined by DFS, which I know from my training to be synthetic cannabinoid, yes, Your Honor, and there is law saying that if the statement to the magistrate is misleading, excise it, take it out, put in what he knew. Yes, I understand your point there. I think it is just going around in a circle and the question is where do we stop? But I appreciate your response. Thank you. Thank you, Your Honor. Thank you very much. We will come down, greet counsel, and go directly to our last case.
judges: Allyson K. Duncan, G. Steven Agee, Albert Diaz